# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA

ERIC WAYNE POEMOCEAH,

          Plaintiff,

     v.

MORTON COUNTY, NORTH
DAKOTA; KYLE KIRCHMEIER, in his
individual capacity; PAUL LANEY, in
his individual capacity; THOMAS
IVERSON, in his individual capacity;
BENJAMIN V. SWENSON, in his
individual capacity; and JOHN DOES 1-
4 (law enforcement personnel, in their
individual capacities),

          Defendants.

Case No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

## NATURE OF ACTION

1.      This is a civil action for compensatory and punitive/exemplary

damages, costs, and attorney fees, under 42 U.S.C. § 1983, 42 U.S.C § 1988,

N.D.C.C. § 9-10-01, and N.D.C.C. § 9-10-06, and the common law of the State of

North Dakota arising from the injuries inflicted by defendants.

2.      This lawsuit arises from an assault/excessive force and deliberate

indifference by several polices officers during a peaceful demonstration by Water

Protectors against the North Dakota Access Pipeline (DAPL) at Standing Rock in

North Dakota in February 2017.

## JURISDICTION AND VENUE

3.      This Action arises under the Fourth and Fourteenth Amendments to

the Constitution of the United States, 42 U.S.C. § 1983 and the laws of the State of

North Dakota.

4.      This Court has original jurisdiction over Mr. Poemoceah's

constitutional and federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a).

5.      This Court has supplemental jurisdiction over Mr. Poemoceah's state

law claims pursuant to 28 U.S.C. § 1367(a), because these claims arise out of the

same operative facts as his federal claims.

6.      This Court has independent original jurisdiction over Mr. Poemoceah's

state law claims pursuant to 28 U.S.C. § 1332, because this action is between

citizens of different states and the matter in controversy exceeds the sum of

$75,000, exclusive of interest and costs.

7.      Venue is proper in the District of North Dakota pursuant to 28 U.S.C. §§ 1391(b)(2), because the events giving rise to these claims occurred in the District of North Dakota.  Venue is further proper in the District of North Dakota pursuant to 28 U.S.C. § 1391(b)(1), because several of the defendants reside in the District of North Dakota and a substantial part of the events or omissions giving rise to Mr. Poemoceah's claims occurred in the District of North Dakota.

## PARTIES

8.      Plaintiff Eric Poemoceah is a citizen and resident of Oklahoma and a member of the Comanche Nation. Mr. Poemoceah was at Standing Rock to support the peaceful opposition to the construction of the Dakota Access Pipeline led by the Oceti Šakowiŋ (the Seven Council Fires, or Great Sioux Nation). At all times, Mr. Poemoceah remained peaceful and non-violent in his opposition to the pipeline.

9.      Defendant Morton County is a political subdivision created and organized in and under the laws of the State of North Dakota.  Defendant Morton County operates the Morton County Sheriff's Office, which has law enforcement authority on North Dakota State Highway 1806 where Mr. Poemoceah was injured on February 22, 2017. Morton County is a body corporate for civil purposes and subject to suit under N.D. Cent. Code § 11-10-01.

10.     Defendant Kyle Kirchmeier is, and was as of February 22, 2017, the Sheriff of Morton County, North Dakota. Defendant Kirchmeier was the incident commander for the law enforcement response to the Water Protectors' DAPL demonstration. Upon information and belief, at all times relevant to this action,

Defendant Kirchmeier had ultimate decision-making authority over the law enforcement response to the Water Protectors' DAPL demonstrations and had supervisory authority over all of the law enforcement officers who responded to those demonstrations.  Defendant Kirchmeir, as an authorized policy maker of Defendant Morton County, supervised, directed, approved, ratified, and acquiesced in Defendant officers' violations of the constitutional rights of Mr. Poemoceah and others on February 22, 2017 and throughout the DAPL demonstrations. Upon information and belief, Defendant Kirchmeier is a citizen and resident of Morton County, North Dakota.

11.     Defendant Paul Laney was, on February 22, 2017, the Sheriff of Cass County, North Dakota. At the request of Defendant Kirchmeier, he served as operations commander for the law enforcement response to the DAPL demonstrations. Defendant Laney also personally participated in the law enforcement response to the DAPL demonstrations between September 2016 and March 2017. At the time of Mr. Poemoceah's injury on February 22, 2017, Defendant Laney was a citizen and resident of Cass County, North Dakota. Defendant Laney is sued in his individual capacity.

12.     Defendant Thomas Iverson is employed by the North Dakota Highway Patrol, currently as a captain. On February 22, 2017, Defendant Iverson was a Lieutenant in the North Dakota Highway Patrol, and part of the command for the law enforcement response to the Water Protectors' Standing Rock DAPL demonstrations. Defendant Iverson is sued in his individual capacity. Upon

information and belief, Defendant Iverson is a citizen and resident of Burleigh County, North Dakota.

13.     Defendant Benjamin V. Swenson is a Bismarck police officer who, upon information and belief, had been deputized by the Morton County Sheriff's office when, on February 22, 2017, at about 4:20 pm, at Highway 1806, he charged at Mr. Poemoceah, tackled Mr. Poemoceah from behind, and caused a fracture of Mr. Poemoceah's superior public ramus (part of the pelvis). Despite hearing Mr. Poemoceah cry out several times that his hip was broken. Defendant Swenson, along with Defendants Does 1 through 5, forced Mr. Poemoceah to walk at least two hundred feet to a law enforcement van.

14.     Swenson was, at all times relevant to this action, a law enforcement officer acting at the direction and under the supervision of the Morton County Sheriff's Office, acting under the color of law and within the scope of his employment.  Defendant Swenson is sued in his individual capacity.  Upon information and belief, Defendant Swenson is a citizen and resident of North Dakota.

15.     According to Swenson's police report, he was assisted in the arrest by two Fargo, North Dakota, police officers, and a deputy sheriff, whose names Swenson did not know; and by defendant Paul Laney.  Video footage shows three officers assisting Swenson in restraining Mr. Poemoceah, and then (with an additional two officers) assisting in the effort to get Mr. Poemoceah to walk to the van.  Not knowing which person is which, and not knowing the names of assisting

officers other than Mr. Laney, plaintiff at this time designates the assisting officers other than Mr. Laney as Does 1 through 4.

16.     Defendants Does 1 through 4 were law enforcement officers acting at the direction and under the supervision of the Morton County Sheriff's Office, acting under the color of law and within the scope of their employment.  Defendants Doe 1 through 4 are sued in their individual capacities.  Upon information and belief, Defendants Doe 1 through 4 are citizens and residents of North Dakota.

17.     Defendants Doe 1 through 4 and Defendant Laney charged towards Mr. Poemoceah without any warning and, after Defendant Swenson tackled Mr. Poemoceah, applied force to Mr. Poemoceah and helped Swenson restrain Poemoceah.

18.     Does 1 through 4 and Defendant Laney all heard Mr. Poemoceah cry out several times that his hip was broken and, nevertheless, forced Mr. Poemoceah to walk at least two hundred feet with a broken pelvis.

19.     Mr. Poemoceah will seek leave to amend this Complaint to name Does 1 through 4 as soon as their identities are ascertained through discovery.  During the Standing Rock demonstrations, law enforcement personnel went to great lengths to conceal their identities. Officers, generally, failed to display their badge, badge number, and name plate. Many officers wore masks concealing their faces.

## FACTUAL BACKGROUND

20.     On February 22, 2017, Eric W. Poemoceah was present as a Water Protector peacefully demonstrating against the Dakota Access Pipeline ("DAPL") at

approximately 4:20PM.  He was unarmed, facing a group of about thirty law

enforcement officers clad in riot gear, with about fifteen feet between him and the

group of officers.  Mr. Poemoceah was calmly, firmly, but not in a loud voice,

reasoning with the officers, in hopes of negotiating a peaceful process for allowing

elders to leave the Water Protector encampment, which had been in place for

several months.

21.    His words to the officers were:

I know you have a job to do and a family to provide for, but why do it with protecting
oil? That's all we're trying to do, sir, is protect -- protect the water. I know – I know
you're looking at me and I know you just shook your head yes because you have a heart.
You have a soul. And I know -- you look like a very prayerful man.  Why don't -- why
don't you be honorable and set down your badge right now in front of 6,100 people.

22.    Mr. Poemoceah's tone and mannerisms were respectful and deferential

to the officers. He made and posed no threat to the officers. He was not armed and

he did not behave aggressively or combatively. He did not menace or yell at officers.

Although he advanced slightly (a couple of feet) while speaking, he remained at a

respectful distance and did not make any sudden movements.

23.    After speaking these words, Mr. Poemoceah was startled to see the

group of officers quickly begin to charge towards him and the two other Water

Protectors who were standing near him, without any notice and in violation of

standard law enforcement practice, basic safety guidelines, and clearly established

law.

24.    On information and belief, the sudden decision to charge toward the

Water Protectors was the result of law enforcement's inability to remain calm, poor

training, a desire to retaliate against Water Protectors, and law enforcement's

general malice and contempt toward the Water Protectors, including Mr. Poemoceah.

25.     Mr. Poemoceah was surprised to be suddenly stampeded by the dozens of riot-gear-clad officers, and instinctively began running.  He had no intent to "flee," as he was never told he was under arrest nor told to stop; he was simply running instinctively to protect himself from assault.

26.     Before Mr. Poemoceah had made it thirty feet, defendant Swenson quickly reached him and violently tackled Mr. Poemoceah from behind, throwing his full weight on top of Mr. Poemoceah and knocking him off the roadway onto the adjacent hill.

27.     After being tackled, Mr. Poemoceah did not resist nor, through any words or actions, indicate any unwillingness to comply with Defendant Swenson.

28.     Does 1 through 4 assisted Swenson in restraining Mr. Poemoceah, with two of them piling on top of Mr. Poemoceah during that process.

29.     Upon information and belief, one or more of the Defendant Does further assaulted Mr. Poemoceah with a fist and/or knee after Mr. Poemoceah was already subdued; and one of the Does injured Mr. Poemoceah's left foot and ankle with his foot or another part of his body.  The video is difficult to discern at this point, and Mr. Poemoceah either briefly lost consciousness at some point or was stunned by the physical shock of the assault.

30.     As a result of the assault, Mr. Poemoceah suffered a pelvic fracture (fracture of the superior pubic ramus), injuries to his neck, ankle, and left wrist; and

severe post-traumatic stress disorder, anxiety, and major depressive disorder related to the incident.

31.     Immediately after being tackled, Mr. Poemoceah repeatedly cried out in pain and repeatedly informed Defendants Swenson, Lanety, and Does 1 through 4 that he felt his hip was broken and requested an ambulance be called. He stated, "You guys, I can't get up. . . . Sir, please don't ….."; "I can't walk. Can you have the ambulance just get me out of here, please?"

32.     Instead of having an ambulance come down the road, or bringing a gurney, the officers mocked Mr. Poemoceah's entreaties and after a couple of minutes forced Mr. Poemoceah to walk at least two hundred feet with a broken pelvis to a police van.  The officers made such statements as "You gotta walk back to get to the medical"; and "Use your words, grow up."  When Mr. Poemoceah finally attempted to comply with the demand that he stand up and walk, he stated, "I just need somebody to hold my left – probably my left side," the immediate response was "Listen – If you quit playing games. . . .  Just cut your stupid shit."  Mr. Poemoceah responded, pleadingly, "I – my hip is probably broke, sir. I'm not playing."  The response was "Just work with us."

33.     After several moments of this disrespectful and uncaring banter by the officers, one officer demanded "Stand up.  Get to your knees and then get one foot out in front of you and stand up.  You're good."  Trying to comply, Mr. Poemoceah moaned in pain, while continuing to call the officers "sir" and remaining polite and calm.

34.     Throughout the interaction, Defendants continued, as they had done to others throughout their policing of Standing Rock, to belittle, dehumanize, and insult Mr. Poemoceah.

35.     Swenson's police report states that he knew Mr. Poemoceah was live-streaming the encounter.

36.     The hostility, malice, and contempt of the Defendant Doe toward Mr. Poemoceah indicate an intent to retaliate against Mr. Poemoceah for his non-violent and peaceful demonstration, and for reporting through live-streaming.

37.     After finally reaching the van, officers transported Mr. Poemoceah to the "main camp," and then an ambulance arrived to bring him to the hospital. However, it became stuck in the mud, and a second ambulance came out.  Mr. Poemoceah finally arrived at the Bismarck Hospital about 6:50 pm, about two and a half hours after the assault. The hospital released him about 9:00 pm, not having discovered the nondisplaced pelvic fracture which was later confirmed.

38.     As was typical during the time of the DAPL demonstrations, staff at Bismarck Hospital downplayed Mr. Poemoceah's request for treatment and determined that, rather than a broken hip, Mr. Poemoceah suffered from "minor contusions."

39.     Mr. Poemoceah was then taken to the Burleigh Morton County Detention Center ("jail"), and then released on bond about 11:10 pm.

40.     Mr. Poemoceah was charged with "physical obstruction of government function" (N.D. 12.1-08-01), a Class A misdemeanor. The charge was later dismissed

9

against Mr. Poemoceah and at least eight other people who were arrested at the same time and location and charged with the same offense as Mr. Poemoceah.

41.     On November 22, 2017, South Central Judicial District Court judge Bruce A. Romanick, on the Court's own motion, found that the State failed to comply with Rule 3(a) of the North Dakota Rules of Criminal Procedure because the State's citations did not contain a written statement of the essential facts constituting the elements of the offense charged. The Court ordered the State to file an amended complaint/information supported by a probable cause affidavit.

42.     The State failed to comply with the Court's order and submitted an amended information that the Court noted "simply tracks the statute [at issue]" and set out "the same information as the inadequate citation set out."

43.     On April 27, 2018, the Court dismissed Mr. Poemoceah's charge, along with the same charge brought against eight other co-defendants, because the State failed to comply with the Court's November 22, 2017 order to comply with the basic requirements of Rule 3(a) of the North Dakota Rules of Criminal Procedure.

44.     The State appealed the Court's decision, but later withdrew the appeal.

45.     As a result of the excessive force, assault, and deliberate indifference of the Defendants, Mr. Poemoceah suffers from extreme pain in his left hip, left leg, left knee, lower back, and ne; and exacerbation of severe post-traumatic stress disorder; generalized anxiety and depression. His injuries severely limit his ability to participate in everyday life and cause him ongoing mental and emotional harm.

46.     Upon information and belief, many of the North Dakota law enforcement officers who participated in the response to the Standing Rock DAPL demonstrations had no prior experience or appropriate training in responding to large-scale demonstrations, the exercise of First Amendment rights by demonstrators, or the use of non- force against nonviolent demonstrators.

47.     As a result of the injuries caused by Defendants, Mr. Poemoceah is unable to run, walk long distances, hike, engage in any moderate or intense recreation, or otherwise enjoy the quality of life he experienced prior to the injuries caused by Defendants.

48.     Mr. Poemoceah has had to undergo regular physical therapy as a result of the injuries he sustained at the hands of Defendants.

49.     It is expected that Mr. Poemoceah will experience the debilitating effects of his pelvis injury for the rest of his life.

**FIRST CAUSE OF ACTION**
**EXCESSIVE FORCE IN VIOLATION OF 42 U.S.C. § 1983**
**(FOURTH AMENDMENT)**
**Individual Defendants**

50.     Mr. Poemoceah restates each and every allegation in the foregoing paragraphs as if fully set forth herein.

51.     While acting under color of law, the individual Defendants physically seized Mr. Poemoceah and injured him, as set forth *supra*, by assaulting him, using excessive force, and forcing him to walk more than 200 feet with a broken pelvis.

52.     Upon information and belief, the individual Defendants were motivated, in part, to attack Mr. Poemoceah because they did not like what Mr.

Poemoceah was saying prior to his arrest, the fact that he was a Water Protector, and that he was reporting on the demonstrations at Standing Rock.

53.    Mr. Poemoceah was seized by the individual Defendants within the meaning of the Fourth Amendment.

54.    The individual Defendants' seizure of Mr. Poemoceah used excessive force, was objectively unreasonable, and violated clearly established law.

55.    Mr. Poemoceah did not pose a threat to the safety of the defendant officers.

56.    Mr. Poemoceah was never told that he was under arrest prior to defendant officers charging and tackling Mr. Poemoceah.

57.    As a direct and foreseeable consequence of the individual Defendants' actions, Mr. Poemoceah has suffered and continues to suffer economic loss due to medical bills and loss of past and future income; and noneconomic loss due to the physical and emotional injuries described *supra*.

58.    As a direct and foreseeable consequence of Defendants Swenson and Does' actions, Mr. Poemoceah was deprived of his rights under the Fourth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION
### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED
### IN VIOLATION OF 42 U.S.C. § 1983
### (FOURTEENTH AMENDMENT)
### Individual Defendants

59.    Mr. Poemoceah restates each and every allegation in the foregoing paragraphs as if fully set forth herein.

60.     While acting under color of law, the individual Defendants, who knew or should have known that Mr. Poemoceah was suffering from a broken pelvis or hip, forced Mr. Poemoceah to walk over 200 feet, depriving him of his liberty without due process of law and aggravating the pain and injury from his fractured pelvis.

61.     The individual Defendants knew or should have known that Mr. Poemoceah's broken pelvis was a serious medical need.

62.     The individual Defendants knew or should have known of an excessive risk to Mr. Poemoceah's health by forcing him to walk over 200 feet with a broken pelvis.

63.     Despite the countless times Mr. Poemoceah cried out that his hip was broken, the individual Defendants disregarded the obvious risk of harm to Mr. Poemoceah by forcing him to walk over 200 feet and failed to take reasonable measures to address Mr. Poemoceah's broken pelvis.

64.     The deliberate indifference of the individual Defendants to Mr. Poemoceah's serious medical need caused and contributed to the economic and noneconomic harm described *supra*.

65.     The deprivation of Mr. Poemoceah's Fourteenth Amendment right to avoid deliberate indifference to a serious medical need by the individual Defendants was objectively unreasonable.

66.     The deprivation of Mr. Poemoceah's liberty by the individual Defendants violated clearly established law.

13

67.     As a direct and foreseeable consequence of the actions of the individual Defendants Mr. Poemoceah was deprived of his rights under the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION
## RETALIATION IN VIOLATION OF 42 U.S.C. § 1983
### (FOURTH AND FIRST AMENDMENTS)
### Individual Defendants

68.     Mr. Poemoceah restates each and every allegation in the foregoing paragraphs as if fully set forth herein.

69.     At all times relevant to this cause of action, the individual Defendants acted under color of state law.

70.     Defendant Swenson was aware Mr. Poemoceah was live-streaming the February 22, 2017, encounter; and, upon information and belief, the individual Defendants were aware that Mr. Poemoceah was engaged in protected speech activity for several months prior to his arrest.

71.     Retaliatory animus for Mr. Poemoceah's exercise of his constitutionally protected right to engage in demonstrations as well as his right to report on such events were a substantially motivating factor in the excessive use of force and deliberate indifference exhibited by the individual Defendants.

72.     Statements made by the individual Defendants during the course of the arrest of Mr. Poemoceah, as noted above, also indicate that retaliatory animus was a substantially motivating factor in the excessive use of force and deliberate indifference they exhibited.

14

73.     The individual Defendants engaged in the retaliatory conduct willfully, maliciously, in bad faith, and in reckless disregard of Mr. Poemoceah's federally protected constitutional rights.

74.     The acts or omissions of the individual Defendants were moving forces behind Mr. Poemoceah's injuries.

75.     Mr. Poemoceah's right to exercise First Amendment freedoms without facing a retaliatory use of force is a clearly established right.

76.     The actions of the individual Defendants would chill a person of ordinary firmness from continuing to engage in the protected activity engaged in by Mr. Poemoceah.

77.     The retaliatory use force and deliberate indifference exhibited against Mr. Poemoceah by the individual Defendants caused and contributed to the economic and noneconomic damages alleged *supra*.

78.     As a direct and proximate cause of the unlawful actions of the individual Defendants, Mr. Poemoceah's rights under the First and Fourth Amendment were violated.

**FOURTH CAUSE OF ACTION**
**EXCESSIVE FORCE IN VIOLATION OF 42 U.S.C. § 1983**
**FOURTH AND FOURTEENTH AMENDMENT**
**(*MONELL v. DEP'T OF SOCIAL SERVS.*, 436 U.S. 658 (1977))**
**(Morton County)**

79.     Mr. Poemoceah restates each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Defendant Kirchmeier Directed, Approved, or Ratified the Objectively Unreasonable and Unconstitutional Use of Force by His Subordinates**

80.    Upon information and belief, Defendant Kyle Kirchmeier had final policymaking authority to determine how law enforcement would respond to the DAPL demonstrations, including the degree of force that could or should be used when arresting Water Protectors.

81.    Upon information and belief, Defendant Kirchmeier coordinated and directed official law enforcement activities regarding the anti-DAPL demonstrations.

82.    It would have been plainly obvious to a reasonable policymaker that charging at non-violent, peaceful demonstrators without warning is objectively unreasonable, violates clearly established law, and would lead to the deprivation of demonstrators' constitutional rights.

83.    It would have been plainly obvious to a reasonable policymaker that brutally tackling unarmed, nonviolent Water Protectors is objectively unreasonable, violates clearly established law, and would lead to the deprivation of demonstrators' constitutional rights.

84.    It would have been plainly obvious to a reasonable policymaker that the routine use of excessive force toward non-violent demonstrators is objectively unreasonable, violates clearly established law, and would lead to the deprivation of demonstrators' constitutional rights.

85.     Upon information and belief, Defendant Kirchmeier nevertheless directed, approved, or ratified the above unconstitutional conduct by his subordinates.

86.     As a direct and foreseeable consequence of the actions of Defendant Morton County (acting through Defendant Kirchmeier), Mr. Poemoceah suffered and continues to suffer substantial the economic and noneconomic damages alleged *supra.*.

87.     As a direct and foreseeable consequence of Defendant Morton County's policy decisions and actions (acting through Defendant Kirchmeier), Mr. Poemoceah was deprived of his rights under the Fourth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

**Defendant Laney Directed, Approved, or Ratified the Objectively Unreasonable and Unconstitutional Use of Force by His Subordinates**

88.     Upon information and belief, Defendant Paul Laney had policymaking authority to determine how law enforcement would respond to the DAPL demonstrations, including the degree of force that could be used against Water Protectors when arresting them.

89.     It would have been plainly obvious to a reasonable policymaker that charging at non-violent, peaceful demonstrations without warning is objectively unreasonable, violates clearly established law, and would lead to the deprivation of demonstrators' constitutional rights.

90.     It would have been plainly obvious to a reasonable policymaker that brutally tackling unarmed, nonviolent Water Protectors is objectively unreasonable, violates clearly established law, and would lead to the deprivation of demonstrators' constitutional rights.

91.     It would have been plainly obvious to a reasonable policymaker that the routine use of excessive force toward non-violent demonstrators is objectively unreasonable, violates clearly established law, and would lead to the deprivation of demonstrators' constitutional rights.

92.     Upon information and belief, Defendant Laney nevertheless directed, approved, or ratified this unconstitutional conduct by his subordinates.

93.     As a direct and foreseeable consequence of the actions of Defendant Morton County (acting through Defendant Laney), Mr. Poemoceah suffered and continues to suffer the economic and noneconomic damages alleged *supra*.

94.     As a direct and foreseeable consequence of Defendant Morton County's policy decisions and actions (acting through Defendant Laney), Mr. Poemoceah was deprived of his rights under the Fourth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

**Morton County Had an Established Policy, Practice, or Custom of Using Force Against Water-Protectors in an Objectively Unreasonable and Unconstitutional Manner**

95.     From at least September 2016 through February 22, 2017, law enforcement officers acting under the direction and supervision of Defendants Kirchmeier, Laney, Iverson, and Morton County established a policy, practice, or

custom of using force against unarmed, nonviolent, non-resisting Water Protectors in an objectively unreasonable and unconstitutional manner.

96.     Defendants Kirchmeier, Laney, Iverson, and Morton County were aware of and approved, ratified, or acquiesced to this policy or custom of using excessive force against Water Protectors.

97.     The individual Defendants, acting pursuant to this established policy or custom of Morton County, and under the color of law, violated Mr. Poemoceah's constitutional rights as he was engaged in nonviolent demonstration against DAPL, as alleged *supra*.

98.     As a direct and foreseeable consequence of the unconstitutional actions of Morton County (through the policies carried out by the individual Defenadnts), Mr. Poemoceah was deprived of his rights under the Fourth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

**Kyle Kirchmeier, Thomas Iverson, Paul Laney, and Morton County Failed to Exercise Adequate Supervisory Responsibility over the Law Enforcement Personnel Responding to DAPL Demonstrations**

99.     Between September 1, 2016 and February 22, 2016, Defendants Kirchmeier, Laney, Iverson, and Morton County turned the Water Protectors' areas from sites of peaceful and prayerful demonstration into a warzone.

100.    During this period, Defendants Kirchmeier, Laney, Iverson, and Morton County had actual or constructive knowledge that the law enforcement officers under their direction and supervision lacked adequate experience and

training to address large scale demonstrations in a reasonable and constitutional manner.

101.   It would have been plainly obvious to a reasonable law enforcement supervisor that the continued use of explosive and less-lethal munitions by officers who lacked adequate experience and training would result in the deprivation Water Protectors' civil rights.

102.   Nevertheless, Defendants Kirchmeier, Laney, Iverson, and Morton County failed to adequately train the law enforcement officers under their direction and supervision in the proper use of explosive and less-lethal munitions with knowledge, or with deliberate indifference to the likelihood, that this inadequate training would result in violations of Water Protectors' constitutional rights.

103.   As a direct and foreseeable consequence of this deliberate indifference, Mr. Poemoceah was deprived of his rights under the Fourth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

**FIFTH CAUSE OF ACTION**
**SUPERVISORY VIOLATIONS OF 42 U.S.C. § 1983**
**(Defendants Kirchmeier, Laney, and Iverson in their individual capacities)**

104.   Mr. Poemoceah incorporates the preceding paragraphs above.

105.   At all times relevant to this lawsuit, Defendants Kirchmeier, Laney, and Iverson were responsible for supervising and directing the conduct of the law enforcement officers who were responding to DAPL demonstrations.

106.    It would have been plainly obvious to a reasonable law enforcement supervisor that adequate experience and training in responding to large-scale demonstrations was necessary to avoid civil rights violations.

107.    Defendants Kirchmeier, Laney, and Iverson had actual or constructive knowledge that the officers under their direction and supervision were routinely using excessive force against Water Protectors in an objectively unreasonable and unconstitutional manner.

108.    Defendants Kirchmeier, Laney, and Iverson had actual or constructive knowledge that the officers under their direction and supervision had inadequate experience and training to respond to large-scale demonstrations in an objectively reasonable and constitutional manner.

109.    Nevertheless, Defendants Kirchmeier, Laney, and Iverson allowed the law enforcement officers under their direction and supervision to continue using excessive force against Water Protectors, with knowledge of and deliberate indifference to the likelihood that such a policy would likely lead to violations of Water Protectors' constitutional rights.

110.    As a direct and foreseeable consequence of this deliberate indifference, Mr. Poemoceah was deprived of his rights under the Fourth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

**SIXTH CAUSE OF ACTION**
**ASSAULT AND BATTERY**
**(Defendant Swenson)**

111.    Mr. Poemoceah restates each and every allegation in the foregoing paragraphs as if fully set forth herein.

112.    On February 22, 2017, Defendant Swenson tackled Mr. Poemoceah with the intent to cause — or with reckless indifference to the unreasonable risk that it would cause — harmful or offensive contact without his consent.

113.    The tackling of Mr. Poemoceah caused a grievous injury to his pelvis.

114.    Defendant Swenson intentionally made physical contact with Mr. Poemoceah without his consent.

115.    Defendant Swenson intentionally placed Mr. Poemoceah in fear of imminent harmful or offensive contact without his consent.

116.    As a direct and foreseeable consequence of Defendant Swenson's actions, Mr. Poemoceah has suffered and continues to suffer the economic and noneconomic damages described *supra*.

### SEVENTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Individual Defendants)

117.    Mr. Poemoceah restates each and every allegation in the foregoing paragraphs as if fully set forth herein.

118.    By assaulting Mr. Poemoceah, then berating him, and then forcing him to walk more than 200 feet with a broken pelvis, the individual Defendants engaged in conduct that was extreme and outrageous.

119.    As a direct and foreseeable consequence of the extreme and outrageous conduct of the individual Defendants Mr. Poemoceah foreseeably suffered severe

emotional distress and mental anguish, and incurred the noneconomic damages alleged *supra*.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff hereby requests:

A.  Compensatory damages in an amount exceeding $75,000, to be established at trial, as compensation for Mr. Poemoceah's economic and noneconomic damages as alleged herein

B.  Punitive and/or exemplary damages in an amount to be established at trial;

C.  An award of attorneys' fees pursuant to 42 U.S.C. § 1988(b);

D.  An award for the costs, expenses, and interest incurred in pursuit of this action;

E.  Whatever additional relief the Court may deem proper.

**JURY DEMAND**

Plaintiff hereby requests a trial by jury on all claims so triable.

Dated:  April 7, 2020.

Respectfully submitted,

_/s/ Marianne Dugan_
Marianne Dugan, Oregon State Bar # 932563
D.N.D. Admission Applied For and Pending
Civil Liberties Defense Center
1430 Willamette St. # 359
Eugene, OR. 97401
(541) 687-9180
mdugan@cldc.org

 _/s/ Lauren Regan_
Lauren Regan, Oregon State Bar # 970878
Admitted to D.N.D.
Civil Liberties Defense Center
1430 Willamette St. # 359
Eugene, OR. 97401
(541) 687-9180
lregan@cldc.org

 _/s/ Cooper Brinson_
Cooper Brinson, Oregon State Bar # 153166
Admitted to D.N.D.
Civil Liberties Defense Center
1430 Willamette St. # 359
Eugene, OR. 97401
(541) 687-9180
cbrinson@cldc.org

*Attorneys for Plaintiff*