IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Eric Wayne Poemoceah,<br><br>Plaintiff,<br><br>vs.<br><br>Benjamin V. Swenson, in his individual capacity,<br><br>Defendant. | Case No. 1:20-cv-00053 |

## ORDER GRANTING DEFENDANT BENJAMIN V. SWENSON'S MOTION FOR SUMMARY JUDGMENT AND FINDING AS MOOT PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## INTRODUCTION

[¶ 1]    THIS MATTER comes before the Court upon a Motion for Summary Judgment filed by Defendant Benjamin V. Swenson ("Swenson") on December 15, 2025. Doc. No. 55. Plaintiff Eric Wayne Poemoceah ("Poemoceah") filed a Response on January 30, 2026. Doc. No. 75. Swenson filed a Reply on February 13, 2026. Doc. No. 81. Poemoceah also filed a Motion for Summary Judgment on "Necessary Party" Affirmative Defense. Doc. No. 51. Swenson filed a Response on January 30, 2026. Doc. No. 74. Poemoceah filed a Reply on February 13, 2026. Doc. No. 83.

[¶ 2]    For the reasons set forth below, the Court **GRANTS** Swenson's Motion for Summary Judgment. Poemoceah's Motion for Partial Summary Judgment is **MOOT**.

## BACKGROUND

### I.    The Dakota Access Pipeline Protests

[¶ 3]    The facts surrounding this dispute are well known and garnered significant media attention. See, e.g., Rebecca Hersher, Key Moments on the Dakota Access Pipeline Fight, NPR, (Feb. 22,

- 1 -

2017), https://www.npr.org/sections/thetwo-way/2017/02/22/514988040/key-moments-in-the-dakota-access-pipeline-fight; Morgan Winsor, et al., Dakota Access Pipeline Protestors Meet with Authorities Over Emergency Evacuation Order, ABC NEWS, (Feb. 17, 2017) https://abcnews.com/US/dakota-access-pipeline-protesters-meet-authorities-emergency-evacuation/story?id=45553457.

[¶ 4]   In April 2016, individuals primarily led by the Standing Rock Sioux Tribe began protesting the construction of the Dakota Access Pipeline ("DAPL") located near the Cannonball River and Lake Oahe north of the Standing Rock Sioux Reservation. Micah L. Issitt, Dakota Access Pipeline Protests, EBSCO, (2023), https://www.ebsco.com/research-starters/political-science/dakota-access-pipeline-protests. During the course of these demonstrations ("DAPL Protests"), protestors principally occupied three areas: the Sacred Stone, Rosebud, and Seven Council Fires (or Oceti Sakowin) Camps, all near the Cannonball River. Doc. Nos. 13-11; 58, ¶ 6. Over the ensuing ten months, these protests and encampments were marked by civil unrest and unlawful activity. Doc. No. 13-1.

[¶ 5]   On August 16, 2016, the level of unrest and unlawful activity prompted local officials to declare a state of emergency. Id. On August 19, 2016, North Dakota Governor Jack Dalrymple issued Executive Order 2016-04, which authorized the North Dakota State Emergency Operations Plan to respond to the situation. Doc. No. 13-2. This Executive Order noted "the impact of continuing unlawful activity could threaten the health, safety and well-being of the general public, protestors and first responders who are committed to protecting life and property," and "the rule of law must be enforced to protect the general public, protestors, and first responders from those who engage in illegal activity." Doc. No. 13-2. Governor Dalrymple also activated the North

Dakota National Guard to support law enforcement and bolster public safety efforts in areas surrounding the encampments. Doc. Nos. 13-3–13-4.

[¶ 6]     On November 27, 2016, the United States Army Corps of Engineers ("Corps") issued a press release. Doc. No. 13-10. The release stated the Corps coordinated with several tribal leaders involved in the ongoing DAPL Protests. Id. at 1. In doing so, the Corps notified all tribal leaders throughout the Missouri River basin by letter on November 25, 2016, that areas of Corps-managed federal property located north of the Cannonball River, including the location of the Oceti Camp, would be closed to the public starting December 5, 2016. Id. Those who chose to stay would be considered unauthorized and could be subject to citation under federal, state, or local laws. Id. The next day, Governor Jack Dalrymple issued Executive Order 2016-08 mandating the total evacuation of the Oceti Camp and surrounding areas south of the Cantapeta Creek and Cannonball River. Doc. No. 13-12, p. 1. This was effective immediately and directed all persons to take all their possessions and not to return to the evacuation area. Id. at 1–2. These orders were necessary due to the ongoing civil unrest, severe winter weather storm conditions, and anticipated harsh winter conditions which had the potential to endanger human life from exposure to harsh winter conditions without proper shelter, dwellings, or sanitation for prolonged periods of time. Doc. Nos. 13-10; 13-12, p. 1.

[¶ 7]     On February 15, 2017, Governor Doug Burgum[1] issued Executive Order 2017-01. Doc. No. 13-14. Because protestors had largely ignored the Corps' eviction order and Governor Dalrymple's Order, Governor Burgum ordered all persons in the evacuation area to leave no later than 2:00 pm on February 22, 2017, and to immediately begin efforts to remove their personal

---

[1] Governor Burgum was elected Governor of North Dakota in November 2016. In 2025, he assumed office as Secretary of Interior of the United States.

property and possessions from the evacuation area. Id. at 1–2. Governor Burgum's Order cited threats of ice jams, overland flooding due to unseasonably warm temperatures, and the fact that the evacuation area routinely experiences major flooding as reasons for ordering protestors to leave. Id. at 1. This Executive Order also noted months of accumulated debris—including significant and dangerous amounts of human waste generated by protestors occupying the evacuation area—posed a significant and increasing environmental threat to the waters of the Missouri River if not quickly removed. Id.

## II.   Poemoceah's Account of the Events on February 22, 2017

[¶ 8]   Poemoceah is Native American (Comanche) from Lawton, Oklahoma. Doc. No. 57-4, pp. 13, 19. Around August or September of 2016, Poemoceah first came to North Dakota for the DAPL Protests, but only stayed three days on this first trip. Id. at 50, 52–53. Over the next few months, he traveled between his home in Oklahoma and North Dakota several times to participate in the DAPL Protests. Id. at 57. He usually stayed at the Oceti Camp. Id. at 66. His final trip for the DAPL Protests happened around February 15, 2017. Id. at 106, 108–10. On this last trip, he would spend his nights at the Prairie Knights Casino to avoid sleeping outside in the frigid North Dakota winter. Id. On February 16, 2017, Poemoceah recalled someone from the Corps telling him and other protesters in the Oceti Camp about the February 22 evacuation deadline. Id. at 114–17.

[¶ 9]   On February 22, 2017, Poemoceah was present for the events unfolding on Highway 1806 near the Oceti Camp. Id. at 112–60. When he arrived around noon, there were approximately thirty protestors still in the camp. Id. at 118–19. According to Poemoceah, approximately fifty officers wearing padded vests and helmets gathered by the Backwater Bridge. Id. at pp. 120–21. At his deposition, Poemoceah claimed he could not recall whether officers said anything to protesters on February 22, 2017, about leaving the camp. Id. at 145, 147–49. He acknowledged hearing or

reading something about an evacuation order and officers extending the deadline, but did not recall officers telling protestors about the deadline. Id. at 147–49. However, throughout that afternoon, Poemoceah had multiple interactions with law enforcement before being tackled. Id. at 137. While at the frontline of the protest, Poemoceah acted as the spokesperson for the protesters to negotiate the exit of three elders still in the Oceti Camp. Id. at 141, 155, 159. He also walked up to and spoke with officers on three occasions that day. Id. at 146.

[¶ 10]  When officers started to remove the protestors from the evacuation area around 4:00 p.m., Poemoceah saw officers advancing forward twice and "grabbing" other protestors. Id. at 142–43, 150. The officers did not retreat after each push but kept advancing. Id. at 152. It appeared to Poemoceah that when officers advanced, they were trying to "catch" protesters. Id. at 154. Poemoceah turned and ran back each time the officers advanced. Id. After about twenty minutes of this back-and-forth with the protestors, on the third advance, Officer Swenson, a police officer with the Bismarck Police Department assigned to the arrest team, ran past the police line to arrest Poemoceah. Doc. Nos. 57-1, pp. 10–11, 15–16; Doc. No. 57-2, p. 2. Poemoceah claims he was "surprised" and "startled" to be suddenly charged by Swenson and the other officers and instinctively began running towards a ditch near the roadway. Doc. Nos. 4, p. 8; 76. He also claims he had no intent to flee officers because he was never told to stop or that he was under arrest. Doc. No. 4, p. 8. Swenson ran after Poemoceah and tackled him to the ground. Doc. No. 57-2, p. 2. Swenson landed on top of Poemoceah, who immediately began yelling that Swenson had broken his hip. Id. Poemoceah was then informed he was under arrest and restrained with zip cuffs. Id.

[¶ 11]  After being arrested, Poemoceah was transported to the emergency room at St. Alexius Hospital in Bismarck, North Dakota, to have his hip examined. Doc. No. 77-4. A fracture was not

detected and he was discharged from the hospital. Id. at 3. Poemoceah was then taken to Burleigh

Morton County Detention Center and released on bond later that night. Doc. No. 4, p. 10.

[¶ 12]  On February 28, 2017, Poemoceah went to the emergency room in Lawton Indian Hospital

back in Oklahoma and had a CT scan performed on his left hip and tailbone. Doc. No. 77-5. He

was diagnosed with a pelvic fracture. Id. at 6. Poemoceah also suffered lighter injuries to his neck,

ankle, and left wrist. Id.[2] The fracture required a lengthy course of physical therapy and the use of

a wheelchair or walker for roughly six months. Id. at 170–76. On December 14, 2017, Poemoceah

was charged with Physical Obstruction of a Governmental Function in violation of North Dakota

law. Doc. No. 77-6.

### III.    Swenson's and Other Officers' Accounts of the Events on February 22, 2017

[¶ 13]  According to Swenson, Governor Burgum's evacuation order was well publicized and he

heard Poemoceah being told by officers he would be arrested if he refused to leave the evacuation

area and continued to approach the police line during enforcement efforts. Doc. No. 57-1, pp. 32,

40. Command staff instructed law enforcement to arrest Poemoceah because he kept approaching

the police line despite being repeatedly told not to. Id. 18, 54–55. Swenson tackled Poemoceah

because he ran away and showed no signs of surrendering to arrest. Id. at 19, 41. While running

after Poemoceah, Swenson did not yell "stop," "you're under arrest" or any similar command. Id.

at 42. Swenson's version of the events are corroborated by his police report:

> [Poemoceah] approached the Police Line multiple times with the group of people
> and he was told by multiple Law Enforcement Officers that they needed to vacate
> the camp and they needed to leave the area so that cleanup activities could continue
> at the Oceti camp. Again these individuals ignored the Law Enforcement
> commands to leave the area and to leave the camp and continue[d] to approach the
> polic[e] line . . .We explained to them . . . again . . . that they needed to leave the

---

[2] Poemoceah also claims experiencing PTSD, anxiety, depression, and recurrent nightmares related to the incident. Doc. Nos. 4, p. 8–9; 77-1, pp. 187–90. He has not provided any medical records diagnosing these conditions.

area immediately . . . or they could continue to come to the police line and risk being arrested . . . I was instructed by command staff that I was on the arrest team [and] that Eric [Poemoceah] was going to be arrested as he continually approached the [p]olice line after being told numerous times that he would be subject to arrest if he continued to remain in the area.

Doc. No. 57-2, p. 2.

[¶ 14] In addition to Swenson's account, numerous other officers at the scene stated protestors were told at various points they would be arrested for approaching the police line or not leaving the area. See, e.g, Doc. Nos. 62-1, pp. 1–2 (Officer Steven Mayer stating he assisted in arrests of individuals for staying within the evacuation area after the deadline and blocking the roadway.); 63-1, pp. 1–2 (Officer Timothy Frank stating "At approximately 16:30, law enforcement encountered approximately 60 resistant protesters on Highway 1806. An order was issued that they vacate the area [or] otherwise they would be subject to arrest. A protester liaison had also previously been informed that anyone left in the camps or on the roadway would be subject to arrest."); 64-1, pp. 1–2 (Officer Tricia Schmeichel stating "Around 1600 hours, a group of people began approaching law enforcement. They were instructed to leave the area or be subject to arrest. Several of these individuals did not want to leave and were placed under arrest as the field force pushed them back."). These same officers arrested multiple protestors when they refused to comply. See, e.g., Doc. Nos. 62-1, pp. 1–2; 63-1, p. 2; 64-1, p. 3–4. Poemoceah was on the roadway when other protestors were arrested. Doc. No. 57-5, 2:29:10–2:56:00.

[¶ 15] Paul Laney, then Cass County Sheriff, specifically recalled Poemoceah repeatedly approaching the police line and then running back after being told protestors would be arrested for approaching the line:

I wouldn't say I saw [Poemoceah] do anything violent other than he would go up and then he'd, you know, run back a few times and then he'd go up. . . . . I saw [Poemoceah] going up to the line and then he'd, you know, come back. And we would warn people, if you go up there, you're going to get arrested; If you go up

there, you're going to get arrested; If you go up there, you're going to get arrested. So he knew – he knew the environment he was in. There's no doubt in my mind about that.

Doc. No. 57-3, pp. 36–37.

### IV.   Livestream Footage of the Events on February 22, 2017

[¶ 16]   Poemoceah also used his cellphone to livestream these events for roughly three hours, including when he was tackled by Swenson ("Livestream"). Doc. No. 57-5. Throughout the course of the Livestream, Poemoceah repeatedly references the 2:00 pm deadline to leave the evacuation area, law enforcement bringing in additional officers to get protestors to comply with the deadline, and being arrested for staying past the deadline. See, e.g, id. at 20:54, 24:05, 28:30, 41:53, 1:02:40. The Livestream also shows officers and a "neutral mediator" repeatedly telling groups of protestors, including Poemoceah, that 2:00 pm was the deadline and law enforcement wanted to see people moving out of the area or they would begin making arrests. See, e.g, id. at 1:02:40, 1:14:50, 2:27:20, 2:35:28. During the police advance prior to the tackle, the Livestream shows officers telling protestors, including Poemoceah, they would be arrested for approaching the police line. Id. at 2:39:10, 2:39:50, 2:40:40. Poemoceah acknowledges the arrest risk for approaching the police line and witnesses other protestors nearby being arrested for approaching the police line and refusing to leave the area. Id. at 2:41:30, 2:45:10, 2:47:05, 2:48:48. Before he was tackled, Poemoceah asked one of the officers "Why don't—why don't you be honorable and set down your badge in front of 6,100 people." Id. at 2:56:05.

### PROCEDURAL HISTORY

[¶ 17]   Following the incident, Poemoceah filed a Complaint against Morton County, Swenson, and other officers who assisted in arresting him. Doc. No. 4. The Complaint contains seven causes of action against the defendants, mostly for 42 U.S.C. § 1983 violations. Id. at 11–23. The causes

of action include: (1) Excessive Force (Individual Defendants), (2) Deliberate Indifference to Serious Medical Need (Individual Defendants), (3) Retaliation (Individual Defendants), (4) Excessive Force-*Monell* Doctrine (Morton County), (5) Supervisory Violations (Defendants Kirchmeier, Laney, and Iverson in their individual capacities), (6) Assault and Battery (Defendant Swenson), and (7) Intentional Infliction of Emotional Distress (Individual Defendants). Id. After an appeal of the Court's prior order dismissing the entire Complaint, the sole remaining cause of action is Claim One–Excessive Force as to Swenson. See Doc. Nos. 25, 27, 31-1. Swenson has moved for summary judgment on this claim, asserting qualified immunity. Doc. No. 55.

**DISCUSSION**

## I.      Legal Standard: Summary Judgment

[¶ 18]   Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, indicates there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine if it has a basis in the record and the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); see also Anderson, 477 U.S. at 252.

[¶ 19]   Accordingly, the burden on the moving party is to "point out to the District Court," that the record, when taken as a whole, does not contain a genuine dispute on a material fact that could lead a rational trier of fact to find in favor of the non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court is required to resolve all conflicts of evidence in favor of the non-moving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.

1976). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." White v. Jackson, 865 F.3d 1064, 1077 (8th Cir. 2017) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).

[¶ 20]  On a motion for summary judgment, the moving party has the burden of establishing the relevant predicate facts. Willingford v. Olson, 592 F.3d 888, 892 (8th Cir. 2010). In the context of excessive force and qualified immunity cases in particular, predicate facts include only "the relevant circumstances and the acts of the parties themselves, and not the conclusions of others about the reasonableness of those actions." Pace v. City of Des Moines, 201 F.3d 1050, 1056 (8th Cir. 2000). Once the predicate facts are established, "the reasonableness of an officer's conduct under the circumstances is a question of law." Malone v. Hinman, 847 F.3d 949, 953 (8th Cir. 2017) (cleaned up).

## II.    Legal Standard: Qualified Immunity

[¶ 21]  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "The determination of whether qualified immunity is applicable in given circumstances is one of 'objective reasonableness.'" Herts v. Smith, 345 F.3d 581, 585 (8th Cir. 2003). The issue is not "whether the defendant acted wrongly, but whether reasonable persons would know they acted in a manner which deprived another of a known constitutional right." Id. (citing Sparr v. Ward, 306 F.3d 589, 593 (8th Cir. 2002)). Courts use a two-step test to determine whether an officer is entitled to qualified immunity: "(1) [whether] the facts, viewed in the light most favorable to the plaintiff, demonstrate the

deprivation of a constitutional or statutory right; and (2) [whether] the right was clearly established at the time of the deprivation." Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012).

### III.   Step One: Swenson's Tackle Does Not Qualify as Excessive Force

[¶ 22]   Beginning with the first step of the qualified immunity analysis, Poemoceah has failed to establish the deprivation of a constitutional right because Swenson's tackle was not excessive force. Jones, 675 F.3d at 1161; Graham v. Connor, 490 U.S. 386, 396–97 (1989).

[¶ 23]   The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. Amend. IV. An excessive force claim that "arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." Graham, 490 U.S. at 394 (citing Tennessee v. Garner, 471 U.S. 1, 6 (1985)). Since Poemoceah alleges excessive force was applied to him in furtherance of his arrest, the Fourth Amendment applies to his excessive force claim.

[¶ 24] Under Graham, Fourth Amendment excessive force claims are analyzed under the objective reasonableness standard. 490 U.S. at 396–97. "As in other Fourth Amendment contexts . . . the reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. Id. at 397 (internal citations omitted). The Supreme Court has described the objective reasonableness standard as follows:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. [T]he test of reasonableness under the Fourth Amendment . . . requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

Id. at 396–97 (internal citations omitted).

[¶ 25]  Importantly, "[a]n arrestee's subjective motive . . . does not bear on how reasonable officers would have interpreted [the arrestee's] behavior" leading up to the application of force. Fischer v. Hoven, 925 F.3d 986, 989 (8th Cir. 2019) (quoting Ehlers v. City of Rapid City, 846 F.3d 1002, 1011 (8th Cir. 2017)). Instead, the relevant inquiry is whether an objectively reasonable officer in the defendant's position could have believed that the arrestee's behavior, based on the totality of the circumstances, justified a particular use of force to effectuate an arrest. See Ehlers, 846 F.3d at 1011 (holding an officer's use of force was not excessive because a reasonable officer could have interpreted the arrestee's behavior as resistance justifying the officer's use of force to arrest him).

[¶ 26]  In this case, Poemoceah has failed to establish Swenson's tackle constitutes excessive force under the Fourth Amendment. Poemoceah was engaging in criminal trespass and obstruction of a government function by remaining in the evacuation area and refusing to leave. See N.D.C.C. §§ 12.1-22-03(6), 12.1-08-01. Poemoceah's conduct was in defiance of two evacuation orders from two successive North Dakota Governors. Doc. Nos. 13-12, 13-14. When Poemoceah refused to leave and fled from law enforcement, force was applied against him by Swenson. Doc. No. 57-5, 2:56:56. He was still within the evacuation area over two hours after the official deadline to evacuate had expired and after the 4:00 pm deadline law enforcement gave protestors to leave before they would begin taking steps to remove protestors from the evacuation area. Id. at 2:47:05.

He also asked an officer to lay down his badge and not perform his duty to remove protestors from the evacuation area. Doc. Nos. 57-2, p. 1; 57-5, 2:56:05.

[¶ 27]  Immediately before and during the police advance on protestors, the Livestream footage shows officers commanding Poemoceah and the other protestors to leave the evacuation area. Doc. No. 57-5, 2:40:40, 2:47:05. In light of the Livestream, it is clear Poemoceah knew approaching the police line would result in arrest. See id. at 2:45:10. Other protestors were arrested near Poemoceah for approaching the line and otherwise refusing to leave the area and he acknowledges the arrests. Id. at 2:41:30, 2:48:48, 2:50:32, 2:50:47. Despite these warnings, Poemoceah approached the police line and ran from officers twice before the final push. Id. at 2:39:50, 2:41:30, 2:47:52, 2:48:48, 2:49:11. When Swenson charged Poemoceah to arrest him, the footage shows Poemoceah running away before Swenson tackled him. Id. at 2:56:55. Poemoceah also admits that he repeatedly approached the police line, despite being told not to, and ran from officers before Swenson tackled him. Doc. Nos. 57-4, p. 154; 76.

[¶ 28]  Based on these facts, it is evident an objectively reasonable officer could have believed Poemoceah was attempting to evade arrest when he ran away from Swenson. Graham, 490 U.S. at 396–97. Accordingly, it was reasonable for Swenson to use some type of force to prevent Poemoceah from successfully evading arrest.  Awnings v. Fullerton, 912 F.3d 1089, 1100 (8th Cir. 2019) ("When an arrestee flees or resists, some use of force by the police is reasonable.") (quoting Greiner v. City of Champlin, 27 F.3d 1346, 1366 (8th Cir. 1994)) (citing Foster v. Metro Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir. 1990)).

[¶ 29]  Regarding the tackle specifically, the Eighth Circuit has held the use of a tackle or similar physical take-down is an accepted method to effectuate an arrest of individuals attempting to resist or evade arrest. See, e.g., Hosea v. City of St. Paul, 867 F.3d 949, 957–59 (8th Cir. 2017) (holding

the officers use of force in tackling or jumping on back of passively resistant arrestee and forcing him to the ground resulting in a hand injury was objectively reasonable); Fischer, 925 F.3d at 989–90 (holding the deputy did not use excessive force when executing an arm-bar takedown against misdemeanant to restrain and handcuff suspect who appeared to be resisting arrest, even though it resulted in the suspect suffering broken bones in her hand, arm, nose, a broken tooth, and a facial cut); Ehlers, 846 F.3d at 1011 (holding the use of a spin take-down to apprehend and arrest a nonviolent misdemeanant did not constitute excessive force because he appeared to be resisting and the officer was entitled to use the force necessary to effect his arrest); White v. Jackson, 865 F.3d at 1080 ("[I]t wasn't an unreasonable use of force to push [the arrestee] to the ground and place a knee on his back" in effectuating his arrest. The right to make an arrest 'necessarily carries with it the right to use come degree of physical coercion or threat thereof to effect it.'") (quoting Graham, 490 U.S. at 396)).

[¶ 30]   In Ehlers, the Eighth Circuit rejected the plaintiff's argument that no use of force was necessary because he, like Poemoceah, was being arrested for a nonviolent misdemeanor. 846 F.3d at 1011. Instead, the Court held the officer's use of a take-down was an acceptable means to effectuate his arrest because the plaintiff appeared to be resisting. Id. By contrast, Poemoceah did not simply appear to be evading arrest, he actively ran away from officers. Doc. Nos. 57-4, p. 154; 76. This context provides an even stronger justification for Swenson's use of force against Poemoceah in the totality of the circumstances in this case when compared to the circumstances in Ehlers. Graham, 490 U.S. at 396–97 ("[T]he test of reasonableness under the Fourth Amendment . . . requires careful attention to the facts and circumstances of each particular case, including . . . whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.").

[¶ 31]  Poemoceah and his expert devote significant attention to Poemoceah's contention that he was not actually fleeing officers since Swenson did not tell Poemoceah he was under arrest or give him an order to stop. Doc. Nos. 75, pp. 4, 16; 76; 77-2, p. 6. Instead, both assert Poemoceah was "surprised" and "startled" to see the officers charging towards him and instinctively ran away from them to protect himself from assault. Doc. Nos. 75, p. 4, 76; 77-2, pp. 6–7.

[¶ 32]  Poemoceah, however, repeatedly referenced and acknowledged the 2:00 pm deadline to leave the evacuation area, officers being on site to ensure protestors leave by the deadline, and officers coming towards the Oceti Camp to get protestors out if they refused to leave. Doc. No. 57-5, 20:54, 22:21, 22:37, 24:05, 28:30, 37:00, 47:24. The Livestream footage also shows officers and a "neutral mediator" telling Poemoceah and the other protestors multiple times they needed to leave and would be arrested if they refused. Id. at 1:14:50, 1:45:05, 2:27:20, 2:35:28. Poemoceah repeatedly acknowledges protestors would be arrested for failing to leave. Id. at 41:53, 47:51, 48:23, 1:01:44, 1:02:40, 1:14:50, 1:20:08, 2:18:15.

[¶ 33]  Immediately before and during the police advance, the Livestream shows officers commanding Poemoceah and other protestors not to approach the police line and leave the area, Poemoceah acknowledged the arrest risk, and other protestors being arrested in close proximity to him for approaching the line and refusing to leave. Id. at 2:40:40, 2:41:30, 2:42:05, 2:45:10, 2:47:05, 2:48:48, 2:50:32, 2:50:47. Minutes before he is tackled, one officer rushed forward and grabbed a protestor mere feet away from Poemoceah and explicitly says to the protestor "You're under arrest." Id. at 2:48:48.

[¶ 34]  Overall, the record shows at least **ten times** relevant authorities specifically told Poemoceah the deadline, asked him to leave, and said protestors could be arrested for refusing to leave or approaching the police line. Id. at 23:30, 1:02:40, 1:13:40, 1:45:05, 2:27:20, 2:35:28,

2:40:40, 2:41:30, 2:45:10, 2:47:05. Poemoceah acknowledged the deadline, law enforcement's requests for protestors to leave, and the possibility of being arrested at least **twenty times**. Id. at 20:54, 22:21, 22:37, 24:05, 28:30, 37:00, 41:53, 47:24, 47:51, 48:23, 1:01:44, 1:02:40, 1:14:50, 1:20:08, 2:18:15, 2:27:20, 2:35:28, 2:42:05, 2:45:10, 2:50:32. This evidence conclusively establishes Poemoceah, rather than being "startled" or "surprised," was well aware he would be arrested for remaining in the evacuation area past the deadline or approaching the police line. Id. at 2:41:30, 2:45:10, 2:47:52, 2:48:48, 2:50:32, 2:50:47. It also shows that officers acted with a significant degree of restraint in the circumstances, only taking steps to arrest protestors when it became absolutely clear many protestors were not going to comply with their repeated requests to leave over a span of several hours. Id.

[¶ 35]  The Livestream footage further corroborates the statements provided by Swenson, Sheriff Laney, and other officers on the scene which give a similar account of the events leading up to the tackle and arrest of Poemoceah and other protestors. Doc. Nos. 57-1, pp. 18, 54–55; 57-2, pp. 1–2; 57-3, pp. 36–37; see, e.g, Doc. Nos. 62-1, pp. 1–2; 63-1, pp. 1–2; 64-1, pp. 1–2. Taken together, this evidence establishes there is no genuine issue of material fact that Poemoceah was aware he was subject to arrest and was attempting to evade arrest when Swenson tackled him. White, 865 F.3d at 1077 ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).

[¶ 36] A reasonable officer in Swenson's position, under these circumstances, would have believed Poemoceah understood he would likely be arrested if he continued to approach the police line and remain in the evacuation area. Graham, 490 U.S. at 396–97. Swenson shouting "stop" or

- 16 -

"you're under arrest" to Poemoceah while running at him or any similar command would have simply reiterated the obvious. See Dundon v. Kirchmeier, 577 F. Supp. 3d 1007, 1053 (D.N.D. 2021), aff'd, 85 F.4th 1250 (8th Cir. 2023) (determining no reasonable person observing officers positioned behind a barricade and using force against others in proximity to the barricade would believe their presence was authorized or lawful, regardless of whether any additional warnings were provided by law enforcement, and noting additional warnings in those circumstances would have been futile).

[¶ 37] Even if Poemoceah was truly "surprised" or "startled," his personal intentions and perceptions have no bearing on how a reasonable officer would have interpreted his behavior. Fischer, 925 F.3d at 989 ("[a]n arrestee's subjective motive . . . does not bear on how reasonable officers would have interpreted [the arrestee's] behavior") (quoting Ehlers, 846 F.3d at 1011). The relevant inquiry is whether an objectively reasonable officer in Swenson's position would have believed Poemoceah was attempting to evade arrest. Graham, 490 U.S. at 396–97 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene . . .") (citing Terry v. Ohio, 392 U.S. 1, 20–22 (1968)). As discussed above, a reasonable officer would have believed Poemoceah's act of running away from law enforcement a third time after approaching the police line multiple times was an attempt to evade arrest that justified Swenson's tackle. Graham, 490 U.S. at 396–97; Ehlers, 846 F.3d at 1011.

[¶ 38] Because there is no genuine dispute of material fact regarding whether Poemoceah was attempting to evade arrest and Swenson's use of a tackle was reasonable under the circumstances, Poemoceah has failed to establish Swenson's actions qualify as excessive force under the Fourth Amendment's objective reasonableness standard.

IV.   **Step Two: Even if Swenson's Tackle Qualified as Excessive Force, The Law was Not Clearly Established at the Time of the Incident**

[¶ 39]   Turning to the second prong of qualified immunity, even if Swenson's tackle was excessive force, Poemoceah has also failed to prove existing case law on February 22, 2017, clearly established a reasonable officer would have known using a tackle on a protestor attempting to evade arrest would qualify as excessive force under the Fourth Amendment. See Kisela v. Hughes, 584 U.S. 100, 104 (2018) (per curiam) ("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue.") (citing Mullenix v. Luna, 577 U.S. 7, 12 (2015)). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates the law." Thompson v. Monticello, 894 F.3d 993, 999 (8th Cir. 2018) (internal quotation marks omitted).

[¶ 40]   Since qualified immunity is an affirmative defense, the defendant bears the burden of proof. Jones, 675 F.3d at 1161. However, to defeat an asserted qualified immunity defense, the plaintiff has the burden to show that the asserted right was clearly established at the time of the alleged violation. Quraishi v. St. Charles Cty., Missouri, 986 F.3d 831, 835 (8th Cir. 2021). While the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." Kisela, 584 U.S. at 104.

[¶ 41]   Poemoceah relies on several distinguishable cases when arguing the law was clearly established to show Swenson's use of force was excessive on February 22, 2017. In Brown v. City of Golden Valley, the officer used a taser on the plaintiff during a traffic stop without any warning when the only alleged noncompliance was disobeying two orders to end her phone call to a 911 operator. She was not attempting to flee or actively resisting arrest when force was applied. 574 F.3d 491, 499 (8th Cir. 2009). Poemoceah, however, was warned repeatedly he would be arrested

for approaching the police line or refusing to leave, did not comply, and actively ran away from law enforcement by his own admission.[3] Doc. Nos. 57-4, p. 154; see e.g., 57-5, 23:30, 1:02:40, 1:13:40, 1:45:05, 2:27:20, 2:35:28, 2:40:40, 2:41:30, 2:45:10, 2:47:05; 76. Poemoceah's reliance on Moore v. Indehar is misplaced considering the officer in that case used lethal force on the plaintiff, which requires a significantly greater justification than non-lethal force, and Swenson did not use any form of lethal force against Poemoceah. 514 F.3d 756 (8th Cir. 2008); Garner 471 U.S. at 11 (holding the use of deadly force against a fleeing suspect who does not pose a significant threat of death or serious physical injury to the officer or others is not permitted.)

[¶ 42]   Poemoceah also relies on Lombardo v. City of St. Louis, Missouri, 594 U.S. 464 (2021), McReynolds v. Schmidli, 4 F.4th 648 (8th Cir. 2021), and Nieters v. Holtan, 83 F.4th 1099 (8th Cir. 2023). These cases, however, were decided after February 22, 2017, meaning the holdings in these cases were not "clearly established at the time" of the alleged use of excessive force for purposes of challenging a qualified immunity defense. Jones, 675 F.3d at 1161.

[¶ 43]   On the contrary, as mentioned above, existing precedent at the time of the incident would have led a reasonable officer to believe that using a tackle or similar physical take-down method on an individual attempting to evade arrest by flight was legally sound. Ehlers, 846 F.3d at 1011 (use of spin take-down to apprehend and arrest a nonviolent misdemeanant did not constitute excessive force because the suspect appeared to be resisting).[4]

---

[3] Poemoceah cites to other Eighth Circuit cases similar to Brown that are distinguishable from this case for nearly identical reasons. See Johnson v. Carroll, 658 F.3d 819 (8th Cir. 2011) (the plaintiff who was pushed to the ground by officers posed no threat and was not actively resisting or attempting to flee); Small v. McCrystal, 708 F.3d 997 (8th Cir. 2013) (plaintiff was not resisting or attempting to flee when he was tackled from behind without any warning); Locke v. Cnty of Hubbard, 152 F.4th 903 (8th Cir. 2025) (plaintiff locked to construction equipment posed no threat and was neither resisting arrest nor attempting to flee).

[4] Poemoceah also references the Eighth Circuit's holding in this case. Doc. No. 75, pp. 23–24. However, the Eighth Circuit assumed all of Poemoceah's factual allegations to be true under Rule

[¶ 44]  Because it was not clearly established at the time of Poemoceah's arrest that the use of a tackle on an individual attempting to evade arrest violates the law, even if Swenson's tackle qualified as excessive force and a deprivation of Poemoceah's constitutional rights, Swenson would still be entitled to qualified immunity. Jones, 675 F.3d at 1161; Thompson, 894 F.3d at 999.

### CONCLUSION

[¶ 45]  Based upon the foregoing, Swenson's Motion for Summary Judgment (Doc. No. 55) is **GRANTED.** Count One of the Complaint (Doc. No. 4) as to Swenson is **DISMISSED with prejudice**.

[¶ 46]  Because the Court is dismissing the sole remaining cause of action in this case, the Motion for Summary Judgment on "Necessary Party" Affirmative Defense is **MOOT** (Doc. No. 51).

[¶ 47]  This Order disposes of the last remaining claim in the Complaint. The entry of judgment is now appropriate consistent with this Court's prior Order and the Eighth Circuit's Judgment and Opinion entered in this case. See Doc. Nos. 25, 26, 27, 31, 31-1.

[¶ 48]  **IT IS SO ORDERED.**

[¶ 49]  **LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED March 30, 2026.

Daniel M. Traynor, District Judge
United States District Court

---

12. As mentioned previously, the evidence now before the Court, especially the Livestream footage (Doc. No. 57-5), makes it clear Poemoceah's allegations are not an accurate representation of the events or Poemoceah's behavior on February 22, 2017 and Swenson's tackle was justified under the circumstances.